IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| MICHAEL ELEY, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | CASE NO. 2:09-cv-958-MEF |
| | ) | |
| THE TRAVELERS INSURANCE | ) | |
| COMPANIES, INC., *et al.*, | ) | (WO – DO NOT PUBLISH) |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

This cause is before the Court on Defendants' Motion for Summary Judgment,

(Doc. # 24), filed on October 25, 2010[1] and Defendants' Motion to Continue Trial, (Doc.

# 42), filed on February 11, 2011.  Plaintiffs originally filed the instant action on

September 15, 2009 in the Circuit Court of Montgomery, Alabama, alleging fraudulent

misrepresentation in relation to the cancellation of a home-insurance policy.  (Doc. # 1

Ex. 2, State Ct. Compl.).  Having removed the suit to this Court on October 14, 2009,

(Doc. # 1), Defendants now seek summary judgment on the basis that Plaintiffs cannot

establish fraudulent misrepresentation under Alabama law.  (Doc. # 24).  After careful

consideration of the arguments of counsel, the relevant case law, and the record as a

---

[1]  Defendants contend that Defendant The Automobile Insurance Company of Hartford, Connecticut ("AICH")—incorrectly identified as The Automobile Insurance Company of Hartford, Connecticut, Inc., (Doc. # 5, AICH Answer ¶ 3),—is "the proper defendant to this action" because it "is the company that issued the insurance policy made the basis of this lawsuit."  (Doc. # 25 at 1–2 n.1).  However, Defendants concede that, for purposes of this motion, "the summary judgment [motion] is filed on behalf of all named defendants."  Thus, for purposes of this motion, all of the defendants shall be referred to as either "Defendants" or "Travelers."

whole, the Court finds that the Motion for Summary Judgment, (Doc. # 34), is due to be

GRANTED and that the Motion to Continue Trial, (Doc. # 42), is due to be DENIED as

MOOT.

## JURISDICTION AND VENUE

The Court exercises subject matter jurisdiction over this action pursuant 28 U.S.C.

§ 1332, based upon the parties' diversity of citizenship[2] and an amount in controversy

exceeding $75,000.00, exclusive of interest and costs.  The parties contest neither

personal jurisdiction nor venue and the Court finds adequate grounds alleged to support

both personal jurisdiction and venue.

## FACTS AND PROCEDURAL HISTORY

### I.  Facts[3]

#### A.  The Insurance Policies Generally

Plaintiffs are husband and wife (individually, "Mr. Eley" and "Mrs. Eley") living

in Montgomery, Alabama, who have "accumulated personal and real property," including

several houses, five vehicles, and various personal items.  (Doc. # 32, at 2).  Mr. Eley is a

---

[2]  Plaintiffs are individuals domiciled in Alabama.  (Doc. # 1 Ex. 2, State Ct. Compl. ¶ 1). Defendant AICH is a corporation organized and existing under the laws of Connecticut with its principal place of business in Connecticut.  (Doc. # 1 ¶ 5).  Defendant The Travelers Companies, Inc.—incorrectly identified as Travelers Insurance Companies, Inc.—is a corporation organized and existing under the laws of Minnesota with its principal place of business in Minnesota.  *Id.* ¶ 6. Defendant The Travelers Indemnity Company—incorrectly identified as The Traveler's Indemnity Company, Inc.—is a corporation organized and existing under the laws of Connecticut.  *Id.* ¶ 7.

[3]  Defendants generally dispute a number of facts alleged by Plaintiffs; however, they concede, for purposes of this motion, that the operative facts are not in dispute.  (Doc. # 25 at 3 n.2).

licensed attorney who has practiced for 29 years in Alabama.  Doc. # 26 Ex. E, Mr. Eley

Dep. 8:18–12:1).  Mrs. Eley is a high school graduate with some secondary education and

a former court reporter.  *Id.* Ex. H, Mrs. Eley Dep. 4:6–17, 10:6–21).

The dispute in this case centers around Plaintiffs' house located at 6597 County

Road 1135, Troy, Alabama (the "County Road house").  (Doc. # 32, at 2); *see also* Doc. #

25, at 3.  For seven or eight years prior to the events at issue in this case, Plaintiffs had

been insured with Defendants.  Prior to September 21, 2008, Plaintiffs had seven different

insurance policies with Defendants, four of which were for homeowner's insurance on

four separate houses owned by Plaintiffs, including the County Road house.[4]  (Doc. # 25,

at 3) (citing Doc. # 26 Ex. A, Jacque Ligdis ("Ligdis") Aff. ¶ 4); *see also* Doc. # 32, at 3

("With respect to the farm [containing the County Road house], [Defendants] had issued

2 policies to cover the 2 houses, contents, farm equipment and personal liability.  The

[Plaintiffs] also had an umbrella policy.") (citing Doc. # 31, at 3 (containing portions of

Mr. Eley's deposition)).  The policies were sold by Thompson Agency, an Independent

Insurance Agency in Montgomery.  (Doc. # 32, at 3).  Thompson Agency also served as

the agent of record, and Stormy Robinson ("Robinson"), a Thompson agent, had been

---

[4]  The County Road property consists of a farm with two houses and hundreds of acres of
property.  The insurance policy for the County Road house covered the main house and the acreage.
However, the smaller house, which was used for storage, was not covered under this policy.  For
purposes of this decision, the phrases "County Road house" or "County Road property" refer to the
main house and the acreage, both of which were initially covered under Defendants' policy.  The
phrase "Guest House" refers to the second, smaller house which was not covered under Defendants'
policy.

Plaintiffs' agent and contact the entire time. *Id.* (citing Doc. # 31, at 6–7 (containing portions of Mr. Eley's deposition)). For the policy associated with the County Road house, the policy number was 981902503-633-1 and the assigned "Account Number" was 981902503. (Doc. # 25, at 3) (citing Doc. # 26 Ex. A, Ligdis Aff. ¶ 4).

Mr. Eley became dissatisfied with Defendants and Robinson. (Doc. # 32, at 3). Mr. Eley did not feel "like he was getting proper representation from . . . Robinson on a number of matters." *Id.* (citing Doc. # 31, at 3–4 (containing portions of Mr. Eley's deposition)). In particular, "[b]y the summer of 2008, Mr. Eley concluded that he 'wasn't being treated fairly'" and that Robinson "was not shopping my insurance to the various companies." *Id.* (citing Doc. # 31, at 4 (containing portions of Mr. Eley's deposition)). In sum, Mr. Eley felt that he was not "getting a proper rate." *Id.* (citing Doc. # 31, at 4 (containing portions of Mr. Eley's deposition)).

**B. The Cancellations**

Around July 29, 2008, Defendants "sent a copy of the Declarations page for the County Road policy to [Plaintiffs]." (Doc. # 25, at 4) (citing Doc. # 26 Ex. A, Ligdis Aff. ¶ 5). The Declarations page "identifies the property to be covered (6597 County Road 1135, Troy, AL), the policy number (981902503-633-1), as well as the corresponding account number for that policy (981902503)." *Id.* (citing Doc. # 26 Ex. B, Continuation Declarations for policy number 981902503-633-1). However, because of his dissatisfaction, Mr. Eley began shopping for other insurance policies through several

4

acquaintances, including another Independent Agent in Montgomery by the name of Ken Wright ("Wright").  (Doc. # 32, at 3); *see also* Doc. # 26 Ex. 5, Mr. Eley Dep. 41:2–11. When Wright provided Mr. Eley with quotes on the homes and cars under policies with his company Safeco, Mr. Eley determined that he could get better rates—nearly $2,500 less than under Defendants' policies—through one of Wright's companies on all of the polices except the one for the County Road house.  (Doc. # 32, at 3); *see also* Doc. # 26 Ex. 5, Mr. Eley Dep. 45:8–46:11.  Under Defendants' policy for the County Road house, Mr. Eley was paying $700 less than the quote from Wright.  (Doc. # 32, at 3); *see also* Doc. # 26 Ex. 5, Mr. Eley Dep. 45:8–13.  Thus, Mr. Eley wanted to cancel his other policies with Defendants but keep the County Road house policy in place.  (Doc. # 32, at 3).  Plaintiffs paid the annual premium on the County Road policy on or about September 11, 2008.  *Id.* (citing Doc. # 26 Ex. E, Mr. Ely Dep. 45:4–13).

### *i.*  **Plaintiffs' Request for Cancellation of All Policies Except the County Road House Policy**

On September 22, 2008, Mr. Eley wrote to Robinson, his insurance agent with Thompson Agency, "notifying her of his desire to cancel of [Plaintiffs'] policies with [Defendants] except the policy on the County Road [house]."  *Id.* (citing Doc. # 31 Ex. A (containing a letter from Mr. Eley to Robinson dated September 22, 2008)); *see also* Doc. # 25, at 4 (citing Doc. # 26 Ex. C (containing the same letter)).  The September 22, 2008 letter states that the cancellations were to be "effective September 24, 2008."  (Doc. # 26 Ex. C; Doc. # 31 at 53, Ex. A).  That same day, Robinson faxed Mr. Eley to inform him

that Defendants would not insure the County Road house as a secondary residence if they did not also insure the primary residence.  (Doc. # 26 Ex. D (fax from Robinson to Mr. Eley dated September 22, 2008); Doc. # 32 Ex. B (the same)) ("Please be advised that [Defendants] will not write a secondary residence without the primary residence insured. Therefore the home located at 6597 county Road 1135, Troy, Al will need to be cancelled September 24, 2008 as well.").  This same fax also included seven "Cancellation Request/Policy Release" forms for Plaintiffs to complete and return in order to cancel all of their policies.  (Doc. # 26 Ex. D; Doc. # 32 Ex. B).  In the fax, Robinson also "inform[ed] [Plaintiffs] that a premium refund for the County Road policy would be mailed to their primary residence."  (Doc. # 25, at 5) (citing Doc. # 26 Ex. D ("A refund will be mailed to [Plaintiffs' primary address] on all policy [sic] cancelled that have been paid.").  Mr. Eley did not return the cancellation forms at that time, which he states was per Robinson's request.  (Doc. # 32, at 4).

After the exchange with Robinson, Mr. Eley states that he called Wright to inquire about Robinson's and Defendants' position.  *Id.*; *see also* Doc. # 26 Ex. E, Mr. Eley Dep. 50:7–11.  Wright allegedly "told Mr. Eley that he did not believe what . . . Robinson had said was, in fact correct."  (Doc. # 32, at 4); *see also* Doc. # 26 Ex. E, Mr. Eley Dep. 50:13–16.  Wright also allegedly stated that as an "outsider looking in, . . . [Robinson] was, quote, pissed off and mad because she had lost [Plaintiffs'] account and premium dollars, and therefore it would . . . cost her money."  Doc. # 26 Ex. E, Mr. Eley Dep.

50:17–21.  Mr. Eley also claims that Wright "said that he believed this was not the way [Defendants] did business, that he felt like a secondary home would be afforded coverage through [Defendants] and that Mr. Eley needed to address it with [Defendants]."  (Doc. # 32, at 4); *see also* Doc. # 26 Ex. E, Mr. Eley Dep. 50:22–51:5.  However, to be extra cautious, Mr. Eley purchased a policy on the County Road property from Safeco.  (Doc. # 32, at 4); *see also* Doc. # 26 Ex. E, Mr. Eley Dep. 51:21–52:5 ("I took extra precaution to make sure that not for one second did I have a piece of property that wasn't insured.  And, therefore, I had double coverage for a short period of time September 24 through September 30, when I canceled it.").

### ii.  Robinson's Additional Requests for Cancellation of All Policies

Mr. Eley claims that Robinson faxed the notice once more on September 25, 2008, "again asking Mr. Eley to execute the cancellation on the County Road property."  (Doc. # 32, at 4).  However, Mr. Eley still "did not execute the cancellation as requested . . . [and] [i]nstead, Mr. Eley decided to take . . . Wright's advice and contact [Defendants] directly."  *Id.* (citing Doc. # 31, at 52, Mr. Eley Dep. 52:11–20).  Plaintiffs claim that they then attempted to contact Defendants several times.  Mrs. Eley tried to contact Defendants with a 1-800 number she had.  *Id.* at 5.  Specifically, she stated:

> I had tried to call [Defendants] a couple of times . . . but could never get to a person to actually speak with.  I didn't know who I need to contact.  All I had was the 1-800 number . . . for claims or whatever.  And so I made a number of calls and I would always get . . . an automated recorded message or whatever.

(Doc. # 26 Ex. H, Mrs. Eley Dep. 21:13–22).  Mr. Eley stated that he also attempted to

7

contact Defendants, calling them on September 26, 2008.  (Doc. # 32, at 5); *see also* Doc. # 26 Ex. E, Mr. Eley Dep. 15–23) ("I had not been successful [contacting Defendants] on the 26th . . . .  And I was spinning my wheels because I couldn't get to the right department.").

The following Monday morning—September 29, 2008—Robinson faxed a third request for the cancellations.  (Doc. # 32, at 5).  At this point, Mr. Eley had already "secured insurance from Safeco." *Id.*  He claims that he was frustrated about Robinson's insistence that he cancel when he "had good reason" to believe that he could indeed insure the County Road property as a secondary residence with Defendants without them insuring his primary residence.  *Id.*  That same day, Mr. Eley signed and submitted all seven of the Cancellation Request/Policy Release forms, including the one for the County Road house.  (Doc. # 25, at 5).  He claims that he signed the documents because of his frustration in dealing with Robinson.  (Doc. # 32, at 5); *see also* Doc. # 26 Ex. E, Mr. Eley Dep. 71:1–7, 72:12–17 ("I did in fact sign documents canceling the policy sent on this last request because I knew that [Robinson] wasn't going to leave me alone and that I'm tired of dealing with her and I'm going to deal with somebody else. . . .  So the status was, I had signed those documents to get [Robinson] from needling me and sending me these—and causing a big stink.  I said, I'll take it up with [Defendants] direct.").

### *iii.*  The Conversations with Sampson

Also on September 29, 2008, Mrs. Eley began making more phone calls to

Defendants, eventually reaching a representative named Billy Sampson ("Sampson").

(Doc. # 32, at 5).  With respect to her conversation with Sampson, Mrs. Eley alleges the

following:

> I told him who I was, proceeded to tell him about the problems we were having, being unhappy with our Travelers' agent and that my husband was wanting to cancel our policies because we had found that we can get lower premiums from another insurance company except for one piece of property that was a farm property, the County Road [property] . . ., and that we had been advised by [Robinson], our agent, that Travelers would not cover just one policy.  We wanted to keep that policy in effect because it was a lower premium.  And a significant amount.  If it had only been, you know, a hundred or two hundred dollars a year, we probably would have just said put them all with one company.  But $700, that's a lot of money when you've got as many policies as we have, pieces of property to cover.
>
> And he said, Ms. Eley, evidently—I had given him the policy numbers and he had looked up our accounts, because he said I'm looking—I know that you've been a Travelers' customer for a number of years, a good customer and we appreciate your business.  I'm sorry that you are unhappy and that you're having a problem . . . But he said, By all means we certainly want to insure this piece of property.  We certainly will insure this piece of property. . . .  And I said, [Robinson's] telling us we can't keep it in effect because you don't have any other premiums, or any other policies, and he said, Well that's not true.  We will certainly be glad to keep that policy in effect.  And I said, Well that is what we want to do.

(Doc. # 26 Ex. H, Mrs. Eley Dep. 24:1–27:10).

Later that same day, Mr. Eley claims that he called Sampson from his home and

"talked for at least 40 minutes" with the "gist of that conversation [being] the same thing

that . . . Sampson had told Mrs. Eley."  (Doc. # 32, at 6).  Mr. Eley also alleges that

Sampson began making negative comments with regards to Robinson's performance as

an agent and the lack of discounts Plaintiffs' were receiving.  *Id.*; *see also* Doc. # 26 Ex.

9

E, Mr. Eley Dep. 62:4–10 ("Mr. Eley, you're not getting the proper discounts that you

should be getting.  Mr. Eley, I'm going to look into this further.  Mr. Eley, we want your

business.  Mr. Eley, [it] doesn't sound like your agent's doing you a very good job.").

Mr. Eley also stated that he asked Sampson how he could stay with Defendants without

having a local agent  (Doc. # 32, at 6); *see also* Doc. # 26 Ex. E, Mr. Eley Dep. 63:16–21.

Mr. Eley claims that Sampson responded, "You don't need an agent.  You're going to call

the claims in. [It] [d]oesn't sound like you got one now."  (Doc. # 32, at 6); *see also* Doc.

# 26 Ex. E, Mr. Eley Dep. 63:22–64:2.  Mr. Eley further alleges that he told Sampson

about signing the cancellation documents, but that he also stated that he didn't really want

to and felt forced to do so.  (Doc. # 32, at 6); *see also* Doc. # 26 Ex. E, Mr. Eley Dep.

71:21–72:2 ("I advise[d] [Sampson that] I've signed documents [cancelling the policies].

This isn't what I want to do.  I was forced to do it.  Forced to do it.").  Mr. Eley claims

that Sampson "assured [him] that he was going to take care of it, that he wanted

[Plaintiffs] to be insured with Travelers, and that [their] agent was not performing up to

[Defendants'] standards and that he was going to take care of it."  (Doc. # 32, at 6); *see

also* Doc. # 26 Ex. E, Mr. Eley Dep. 72:4–9.  Thus, Mr. Eley "thought it had been

resolved."  (Doc. # 32, at 6); *see also* Doc. # 26 Ex. E, Mr. Eley Dep. 72:0–10.

The following day—September 30, 2008—Mr. Eley "sent a fax which included a

cover letter; the letter to . . . Robinson of September 22 requesting cancellations on all

policies other than the County Road property; and the cancellation notices including the

one he signed the day before on the County Road property." (Doc. # 32, at 7) (citing Doc. # 31, at 56, Ex. C).  Defendants' emphasize that the cover letter "specifically stated that [Plaintiffs] had already obtained other insurance on the County Road property." (Doc. # 25, at 6) (citing Doc. # 26 Ex. G).[5]  They further point out that "[n]owhere in this letter did [Plaintiffs] ever mention that they still wanted to keep the Country Road policy in place and nowhere did they request that the enclosed Cancellation Request/Policy Release on the County Road policy be withdrawn or that the policy be reinstated."  *Id.*  Plaintiffs also claim that, also on September 30, 2008, Mrs. Eley attempted to send Sampson an e-mail confirming their prior conversations regarding keeping the Country Road policy in effect.  (Doc. # 26 Ex. H, Mrs. Eley Dep. 27:11–13, 32:17–20).  However, Mrs. Eley sent the confirmation e-mail to the wrong e-mail address and never received any confirmation from Sampson had received the e-mail.  *Id.* 34:21–35:6, 36:2–10.

On October 1, 2008, Defendants processed Plaintiffs' cancellation requests, thereby canceling all of the policies with an effective date of September 24, 2008.  (Doc. # 25, at 5).  Defendants emphasize that the cancellation form "contains a 'Policy Release Statement' that specifically releases Travelers and its agent and representatives from any

---

[5]  Specifically, the September 30, 2008 cover letter from Mr. Eley to Sampson stated the following:
> Attached is a letter directed to [Robinson] along with the Cancellation Requests.  As you can see from my letter at that time I wanted the 6597 County Road 1135, Troy policy to stay with Turner Insurance but [Robinson] advised that they would not keep just that one policy.  Therefore I obtained insurance on that property as well.

Doc. # 26 Ex. G.

claims of any type with regard to the County Road policy after the cancellation." *Id.* (citing Doc. # 26 Ex. F (the signed Cancellation Request / Policy Release form for the Country Road property)).[6]   Based on this cancellation, on October 6, 2008, Defendants "issued two premium refund checks totaling $1,279.00 to [Plaintiffs] for the unearned premiums on the County Road policy." *Id.* at 7 (citing Doc. # 26 Ex. J (copy of Check number 82239903 for $1,273.00); Ex. K (copy of check number 82343556 for $6.00)). Both checks contain the account number 981902503, which is the account number assigned to policy 981902503-633-1—the policy for the County Road property.  (Doc. # 26 Exs. J, K).  Defendants further claim that it is undisputed that Plaintiffs "endorsed and cashed both of the premium refund checks on or about October 13 and October 20, 2008."  (Doc. # 25, at 8) (citing Doc. # 25 Exs. J, K).  They point out that Plaintiffs "kept and used the premium refund money, and at no time did they ever return any of hte premium refund money to travelers."  *Id.* (citing Doc. # 26 Ex. E, Mr. Eley Dep. 124:12–23, 125:1–6).

### C.  Conversations with Poe

Following their conversations with Sampson, Plaintiffs "assum[ed] . . . Sampson was truthful when he represented that the Travelers' policy on the County Road property would remain in force."  (Doc. # 32, at 7); *see also id.* ("Based upon . . . Sampson's

---

[6]  Specifically, the "Policy Release Statement" states that "'[n]o claims of any type will be made against the Insurance Company, its agents, or representatives, under this policy for losses which occur after the date of cancellation shown above.'" (Doc. # 25, at 6 n.3) (quoting Doc. # 26 Ex. G).

representations, Mr. Eley concluded that after he had faxed the . . . information to . . . Sampson that [he] was going to make sure the policy on the County Road property stayed in force despite the cancellation notice."); Doc. # 26 Ex. E, Mr. Eley Dep. 72:13–16. Because of this belief, Mr. Eley "notified . . . Wright to cancel the coverage on the County Road property that was written by Safeco during the time Mr. Eley was uncertain about the status of the Travelers' policy." (Doc. # 32, at 7); *see also* Doc. # 26 Ex. E, Mr. Eley Dep. 74:20–23.

By December of 2008, Plaintiffs were working with Doug Poe ("Poe"), another Independent Agent in Montgomery, to get insurance coverage for the Guest House located on the same farm as the County Road house. (Doc. # 32, at 8); *see also* Doc. # 26 Ex. L, Poe Dep. 57:7–15. According to Poe, Mr. Eley told him that the larger house on the County Road property was already covered by Defendants. (Doc. # 32, at 8); *see also* Doc. # 26 Ex. L, Poe Dep. 57:11–14 ("[D]on't worry about the County Road 1135 house, the big house. They never did cancel that policy, I've still got it with Travelers."). As Poe gathered information for a potential insurance policy on the Guest House, he realized he needed to make sure that the Travelers policy had liability coverage for the entire acreage of the property. (Doc. # 32, at 8); *see also* Doc. # 26 Ex. L, Poe Dep. 66:1–10 ("I need[ed] to . . . make sure his acreage has coverage, because I know [Mr. Eley] likes to take friends hunting and I wanted to make sure I was covered, that I had done my job and didn't insure a house that didn't have any liability on the grounds.").

13

Thus, Poe claims that he called Travelers to double-check that the acreage was covered, speaking either to his contact at Travelers—Betty Simmons ("Simmons") in the underwriting department—or customer service.  (Doc. # 26 Ex. L, Poe Dep. 67:12–14). According to Poe, the person at Travelers told him that they did indeed have coverage for the acreage, so Poe provided Mr. Eley with a policy covering only the small house.  *Id.* 68:2–8 ("And I'm sure she said, wait a second, whatever she looked up, . . . and then said, yes, we do have liability on the acreage.  I said, well, good. So all I gave him was the premises liability on his small house.  I didn't give him the general liability."). Defendants emphasize that Poe "did not provide a policy number, did not discuss the specifics of any policy, and did not ask about the specific coverages available under a specific policy.  (Doc. # 25, at 9) (citing Doc. # 26 Ex. L, Poe Dep. 78:15–21). However, Poe further testified that, had he known that there was no coverage on the larger house and acreage, he "would[] [have] written a policy with someone on that house" because he "get[s] paid by commission" and "would[] [not] have let that house go undercovered."  (Doc. # 26 Ex. L, Poe Dep. 67:12–14 69:11–16); *see also id.* 125:3–15 (stating that it was clear to him that Mr. Eley's policy on the County Road house and property was "still in full force and effect" and that he "would've written some coverage on it" had there been none).

### D.  The Burglary

In July of 2009, the larger house at the property was burglarized and several items

of property were stolen or damaged.  (Doc. # 25, at 9) (citing Doc. # 26 Ex. M, Alabama Uniform Incident/Offense Report); *see also* Doc. # 32, at 11.  Specifically, Plaintiffs claimed that two all-terrain vehicles ("ATVs"), several tools, and a tree stand were stolen from the property.  (Doc. # 26 Ex. M, Alabama Uniform Incident/Offense Report).[7] Additionally, they claimed damage to food, a window, and a fishing rod.  *Id.*  Thus, Plaintiffs valued their losses as a result of the burglary at $8,250.00.  *See id.*; *see also* Doc. # 26 Ex. E, Mr. Eley Dep. 161:6–162:4.

On July 22, 2009, Mr. Eley called Travelers and spoke with Charlotte Holland ("Holland") in order to report the claim directly.  (Doc. # 32, at 11); *see also* Doc. # 26 Ex. E, Mr. Eley Dep. 97:2–17.  Holland informed Mr. Eley that the policy for the County Road house had been canceled in 2008.  (Doc. # 32, at 11); *see also* Doc. # 26 Ex. E, Mr. Eley Dep. 97:18–23.  Mr. Eley then informed Holland of the events leading to the cancellation of his policies with Defendants and his belief that the policy on the County Road property was still in effect.  (Doc. # 32, at 11); *see also* Doc. # 26 Ex. E, Mr. Eley Dep. 98:10–99:12.  Mr. Eley also got Poe on the phone "to verify Mr. Eley's position that the County Road policy was in place."  (Doc. # 32, at 11); *see also* Doc. # 26 Ex. E, Mr. Eley Dep. 98:17–19, 101:18–21.  Mr. Eley had several conversations with Holland, who stated during one of them that "this is confusing."  (Doc. # 32, at 11); *see also* Doc. # 26

---

[7] Other items of lesser value were also apparently stolen.  *See e.g.*, Doc. # 26 Ex. E, Mr. Eley Dep. 162:4–10 ("And there's some other things that are missing that are insignificant . . . .  But there was a chicken lamp that was handed down.  And I don't have any idea—it didn't mean much to me, but it may have meant more to [Mrs. Eley].").

Ex. E, Mr. Eley Dep.112:9–10.  Holland also informed Mr. Eley that "it appeared to her that claims had canceled the policy but that underwriting still had it open."  Doc. # 26 Ex. E, Mr. Eley Dep.112:10–13.  Mr. Eley then explained that if underwriting referred to Simmons—Poe's contact at Travelers—then that was the person with whom Doug had confirmed the existence of the County Road policy.  *Id.* 112:13–16.  Mr. Eley felt that there was clearly some mix-up at Travelers.  *Id.* 112:21–22 ("[T]he right foot didn't know what the left foot was doing.").

After realizing that Holland would be unable to help him, Mr. Eley then spoke to a woman named Leslie Whitton or Whittington ("Whittington").  (Doc. # 32, at 12); *see also* Doc. # 26 Ex. E, Mr. Eley Dep.134:8–22.  Mr. Eley had two conversations with Whittington.  (Doc. # 26 Ex. E, Mr. Eley Dep.135:4).  During the second conversation, Mr. Eley claims that Whittington pulled up the notes on the computer and went over the pertinent events with him.  (Doc. # 32, at 12); *see also* Doc. # 26 Ex. E, Mr. Eley Dep 136:12–21.  Like Holland, Whittington allegedly told Mr. Eley that there "seemed to be some conflict" between the departments because "one department said that the file was closed and the other department seemed to say that it was still open."  Doc. # 26 Ex. E, Mr. Eley Dep. 137:1–5; *see also id.* 139:6–10 (stating that Whittington told Mr. Eley, "It appears that one branch, claims, says that you're canceled, and the other branch, underwriting . . ., says that you're covered.").

Defendants denied Plaintiffs' claim with a letter dated August 4, 2009, on the

grounds that the property was cancelled on September 22, 2008.  (Doc. # 25, at 10) (citing

Doc. # 26 Ex. N, August 4, 2009 Denial Letter); *see also* Doc. # 31, at 67 Ex. D.

Plaintiffs received this letter on or about August 20, 2009.  (Doc. # 25, at 10).

## II.  Procedural History

On September 15, 2009, Plaintiffs filed suit in the Circuit Court of Montgomery,

Alabama alleging fraudulent misrepresentation as to whether the policy for the County

Road house was still in effect.  (Doc. # 1 Ex. 2, State Ct. Compl.).  Specifically, Plaintiffs

claim fraudulent misrepresentation based upon two sets of statements from Defendants'

agents: (1) those from Sampson to Plaintiffs occurring in September of 2008 and (2)

those from the unknown agent to Poe occurring in December of 2008.  On October 14,

2009, Defendants removed the case to this Court based on diversity jurisdiction.  (Doc. #

1).  Defendants moved for summary judgment on October 25, 2010, (Doc. # 24), arguing

that Plaintiffs cannot establish fraudulent misrepresentation and that the action is barred

by the doctrine of waiver.  (Doc. # 25, at 12–13).

## SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate "if

the pleadings, depositions, answers to interrogatories, and admissions on file, together

with the affidavits, if any, show that there is no genuine issue as to any material fact and

that the moving party is entitled to a judgment as a matter of law."  *Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 322 (1986); *see also* Fed. R. Civ. Pro. 56(a).  The party asking for

summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."[8] *Celotex*, 477 U.S. at 323.  The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing the non-moving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  *Id.* at 322–23; *see also Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115–16 (11th Cir. 1993) ("For issues, however, on which the non-movant would bear the burden of proof at trial, . . . '[t]he moving party may simply show[]—that is, point[] out to the district court—that there is an absence of evidence to support the non-moving party's case.'") (quoting *U.S. v. Four Parcels of Real Property*, 941 F.2d 1428, 1437–38 (11th Cir. 1991)).

Once the moving party has met its burden, the non-movant must "go beyond the pleadings" and show that there is a genuine issue for trial.  *Celotex*, 477 U.S. at 324; *see also* Fed. R. Civ. Pro. 56(c)(1) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by (A) citing to particular parts of materials in the

---

[8] "An issue is not genuine if it is unsupported by evidence, or if it is created by evidence that is 'merely colorable' or is 'not significantly probative.'" *Lewis*, 908 F. Supp. at 943–44. (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)).  "Similarly, a fact is not material unless it is identified by the controlling substantive law as an essential element of the nonmoving party's case." *Id.* at 944 (citing *Anderson*, 477 U.S. at 248).

record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."). A genuine dispute as to a material fact can only be found "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). *To avoid summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts*." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (emphasis added). A plaintiff must present evidence demonstrating that he can establish the basic elements of his claim. *Celotex,* 477 U.S. at 322. A court ruling on a motion for summary judgment must believe the evidence of the non-movant and must draw all justifiable inferences from the evidence in the non-moving party's favor. *Anderson*, 477 U.S. at 255. After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a).

## DISCUSSION

Here, Defendants contend that they are entitled to summary judgment because Plaintiffs have failed to establish a prima facie case of fraudulent misrepresentation and

because the action is barred by the doctrine of waiver.  (Doc. # 25, at 12–13).

Alabama law[9] provides a cause of action for fraud "accompanied with damage to the party defrauded."  Ala. Code § 6-5-100 (1975).  Furthermore, fraud under Alabama law need not include an intent to deceive or defraud.  *Id.* § 6-5-101 ("Misrepresentations of material fact made willfully to deceive, or recklessly without knowledge, and acted on by the opposite party, *or if made by mistake and innocently* and acted on by the opposite party, constitute legal fraud.") (emphasis added); *see also Burlington N. R.R. Co. v. Warren*, 574 So. 2d 758, 766–77 (Ala. 1990) ("This Court has long held that statements of fact made recklessly, without knowledge, *or by mistake*, and acted upon, are actionable even without fraudulent intent.") (citations omitted) (emphasis added); *Coaker v. Washington County Bd. of Educ.*, 646 So. 2d 38, 42 (Ala. Civ. App. 1993) ("In Alabama, the legal definition of fraud includes even innocent misrepresentations if the misrepresentation concerns an existing material fact upon which the plaintiff relied, proximately resulting in damage to him.  The good faith of a party in making a representation that later proves to be false is immaterial; in the eyes of the law, the misrepresentation is as fraudulent as if it had been intentional.") (citations omitted).

Thus, to establish a prima facie case of fraudulent misrepresentation under Alabama law, a plaintiff must show "(1) that [the defendant] made a false misrepresentation, (2) that the misrepresentation involved a material fact, (3) that the

---

[9]  The parties agree that Alabama law provides the substantive law for this action, and this Court has found nothing to contradict this.  Therefore, Alabama law will be applied.

[plaintiff] relied on the misrepresentation, and (4) that the misrepresentation damaged the

[plaintiff]." *AmerUs Life Ins. Co. v. Smith*, 5 So. 3d 1200, 1207 (Ala. 2008); *see also*

*AstraZeneca LP v. State*, 41 So. 3d 15, 26 (Ala. 2009).  With respect to the third prong,

Alabama law follows "[t]he 'reasonable reliance' standard" which requires that any

reliance be reasonable "based on all the circumstances surrounding the transaction."

*AmerUS*, 41 So. 3d at 1207; *see also Cook's Pest Control, Inc. v. Rebar*, 28 So. 3d 716,

727 (Ala. 2009) ("[I]n order to recover for misrepresentation, the plaintiff's reliance must,

therefore, have been reasonable under the circumstances.  If the circumstances are such

that a reasonably prudent person who exercised ordinary care would have discovered the

true facts, the plaintiffs should not recover.") (citations omitted).  "[W]here the

undisputed evidence indicates that the party or parties claiming fraud in a particular

transaction were fully capable of reading and understanding their documents, but

nonetheless made a deliberate decision to ignore written contract terms that clearly

contradicted the alleged misrepresentations", reliance may be found to be unreasonable as

a matter of law.  *Id.* (citations omitted).

Here, Defendants make three arguments as to why Plaintiffs fail to establish a

prima facie case of fraudulent misrepresentation.  First, they contend that Plaintiffs cannot

prove reasonable reliance upon Sampson's statements in September of 2008.  (Doc. # 25,

at 12).  Second, they contend that Plaintiffs cannot establish any misrepresentation made

by one of Defendants' agents in December of 2008.  *Id.*  Finally, even assuming a

21

misrepresentation was made in December of 2008, Defendants argue that Plaintiffs cannot establish reasonable reliance on any such statement.  *Id.*

**I.  Reasonable Reliance on Sampson's Statements in September of 2008**

Under Alabama law, "'a plaintiff who is capable of reading documents, but who does not read them or investigate facts that *should* provoke inquiry, has not reasonably relied upon a defendant's oral representation that contradict the written terms in the documents.'"  *AmerUS*, 5 So. 3d at 1208 (emphasis added)).  Thus, Alabama law makes clear that the focus remains on what a "reasonably prudent person who exercised ordinary care would have discovered,"  *Torres v. State Farm Fire & Cas. Co.*, 438 So. 2d 757, 759 (Ala. 1983), "based on all the circumstances surrounding a transaction."  *Foremost Insur. Co. v. Parham*, 693 So. 2d 409, 421 (Ala. 1997).

**A.  Defendants' Arguments**

Defendants contend that Plaintiffs could not have reasonably relied upon Sampson's statements in September of 2008 that he "would take care of it" and that the Plaintiffs would indeed be insured on the County Road property through Travelers.  *Id.* at 13–16.  They emphasize the following undisputed facts as evidence that any reliance on Sampson's statements would be unreasonable:

(1)    Mr. Eley is a licensed attorney who has practiced for 29 years in Alabama, while Mrs. Eley is a former court reporter.

(2)    Plaintiffs voluntarily executed the Cancellation Request/Policy Release for the County Road property on September 29, 2008;

(3)     Mrs. Eley attempted to confirm that the County Road policy was still in effect by e-mailing Sampson on September 30, 2008;

(4)     Mrs. Eley sent the e-mail to the wrong e-mail address and, therefore, never received a response from Sampson;

(4)     Plaintiffs' Declarations page for the County Road policy clearly states the account number for that policy;

(5)     The refund checks sent by Defendants to Plaintiffs also clearly referenced that account number; and

(5)     Plaintiffs "received and deposited [the] two premium refund checks . . . within three weeks following the alleged conversation with Sampson."

*Id.* at 13–14, 16–17.

Based on these facts, Defendants contend that both Mr. and Mrs. Eley were "capable of reading documents and were capable of reading the account number printed on the face of the two refund checks." *Id.* at 15.  Defendants further argue that Plaintiffs "had access to and were capable of referencing their policy Declarations page to determine the account number associated with each policy and to determine to which policy the refund applied." *Id.*  Thus, Defendants contend that Plaintiffs "had a duty to examine the refund checks and to investigate once they received them." *Id.* at 15–16.

Defendants stress that Plaintiffs admitted that, "had they paid attention to the information on the face of the checks and realized that the checks were for the County Road policy, they would have known that the County Road policy was canceled." *Id.* (citing Doc. # 26 Ex. E, Mr. Eley Dep. 144:10–19 (stating that, had he known the checks were refunds on the County Road policy, it would have directly contradicted what

23

Sampson told him and he would have "immediately . . . rectif[ied] the situation"); Ex. H, Mrs. Eley Dep. 47:11–23 ("If I had known it was for a refund on [the County Road] policy, we would have been calling and saying, Here, we need to send you some money because this policy is still in effect.  We didn't want it canceled.")).  However, as Defendants point out, Plaintiffs admitted that "they deposited the two refund checks without making any effort to determine to which policy the two County Road policy refund checks applied."  *Id.* at 14 (citing Doc. # 26 Ex. E, Mr. Eley Dep. 146:9–14 (stating that he did not pull out the policy upon receipt of the checks because he "[d]idn't think he had any reason to" since he thought the issue "was resolved"); Ex. H, Mrs. Eley Dep. 45:22–23, 46:1–7 (stating that she did not pull out the policies to see what the checks might have applied to nor did she pull out any premium notices to see what kind of outstanding premiums Plaintiffs might have had on any of the policies)).

Pointing to Mrs. Eley's September 30, 2008 e-mail, Defendants argue that Plaintiffs "recognized the need to confirm their intent to withdraw the Cancellation Request/Policy Release in writing and the need to receive Travelers' written confirmation of its receipt of the same."  *Id.* at 16.  However, Defendants emphasize that Plaintiffs "never followed up to ensure that the e-mail was received and never received the requested response from Travelers confirming that the policy would be kept in place."  *Id.* at 17 (citing Ex. H, Mrs. Eley Dep. 36:2–13).  Defendants argue that, instead of conducting a reasonable investigation into the checks and the failure to receive a response

to the e-mail, Plaintiffs merely "operated under the assumption that Travelers would ignore their written, signed Cancellation Request/Policy Release form and keep the policy in place without any confirmation of such from Travelers."  In sum, Defendants contend that Plaintiffs failed to reasonably investigate the checks and to reasonably follow up on whether Sampson had, in fact, kept the policy in place, then their reliance on Sampson's statements must be unreasonable as a matter of law.  *Id.* at 18 (citing *Torres*, 438 So. 2d 757, 759 (Ala. 1983) ("Because it is the policy of courts not only to discourage fraud but also to discourage negligence and inattention to one's own interests, *the right of reliance comes with a concomitant duty on the part of the plaintiffs to exercise some measure of precaution to safeguard their interests*.") (emphasis added)).

**B.  Plaintiffs' Arguments**

Plaintiffs claim that they received several refund checks during this time period and they "thought the checks 'were for all of the homes that [they] had insured less this County Road property since [they] thought [they] were keeping that one in force and effect."  (Doc. # 32, at 14) (citing Mrs. Eley Dep. 45:1–48–1); *see also* Doc. # 26 Ex. E, Mr. Eley Dep. 78:7–10 (stating that he obviously did not realize at the time the check was endorsed that it was for the County Road policy).[10]  Similarly, Plaintiffs emphasize that had they known the checks were premium refunds on the Country Road policy, then they

---

[10]  Mrs. Eley could not actually remember the exact number of checks received during this time period, but she does "remember more than one."  (Doc. # 26 Ex. H, Mrs. Eley Dep. 46:19–47:2); *see also id.* 47:4–5 ("I can't tell you if it was two or three.").

would not have cashed them.  (Doc. # 32, at 14).  However, they claim that "[i]n light of the fact that Sampson represented that the policy would remain in force [Plaintiffs'] reliance was reasonable."  *Id.*  Finally, Plaintiffs point out that, because two Travelers' representatives stated that the underwriting department had the policy in force while the claims department showed it was canceled, "it seems silly to say [Plaintiffs] were unreasonable in believing the policy was in force."  *Id.* at 15.[11]

### C.  Analysis

In order to determine whether Plaintiffs' reliance on Sampson's statement was reasonable or not, this Court must focus on what an ordinarily prudent person would have done under the circumstances of the transaction.  Here, it is undisputed that Plaintiffs filled out, signed, and turned in cancellation requests for all seven policies, including the

---

[11]  Plaintiffs also contend that the failure to read written documents refers to the failure to read *contract* terms.  (Doc. # 32, at 14) (citing *Foremost*, 693 So. 2d at 421 ("[A] trial court can enter judgment as a matter of law in a fraud case where the undisputed evidence indicates that the party or parties claiming fraud in a particular transaction were fully capable of reading and understanding their documents, but nonetheless made a deliberate decision to ignore written contract terms.")).  Because the checks were not written contracts, Plaintiffs argue that the Alabama precedent cited by Defendants is inapplicable.  *Id.*

However, such arguments are without merit because Alabama law clearly holds that a plaintiff in a fraudulent misrepresentation case must read and reasonably investigate all documents associated with a transaction, not just the written contract.  *See AmerUS*, 5 So. 3d at 1208 ("[A] plaintiff who is capable of reading *documents*, but who does not read them or investigate facts that should provoke inquiry, has not reasonably relied upon a defendant's oral representation that contradict the *written terms in the documents*." (emphasis added)); *see also Potter v. First Real Estate Co.*, 844 So. 2d 540 (Ala. 2002) (finding an exception to the general rule that a plaintiff must read the documents associated with a transaction in a fraudulent misrepresentation case where the person allegedly committing the fraud had a special relationship to the plaintiff and repeatedly misrepresented the contents of the document, which was a survey of property being bought—not the contract itself).

County Road policy.  For purposes of this decision, it is also undisputed that Plaintiffs

spoke to Sampson that same day.  In this conversation, Sampson told Plaintiffs that he

*would* take care of the situation, *not* that it was already done.[12]  Thus, a reasonably

prudent person, *having filled out and signed a written cancellation request on the*

*disputed policy*, should have ensured that the policy was, in fact, still in place.  Indeed, no

---

[12]  Although neither party argues the following, it appears to this Court that Sampson's statements constitute promissory fraud under Alabama law.  Under Alabama law, "fraud is the false representation of a *material existing fact* inducing reliance and causing damages."  *Green Tree Acceptance, Inc. v. Doan*, 529 So. 2d 201, 206 (Ala. 1988) (citing Ala. Code §§ 6-5-101 *et seq.*) (per curium) (emphasis in original). Promissory fraud, on the other hand, occurs by the failure to perform a promise—*i.e.* the failure to perform some promised future act.  Se*e, e.g.*, *id.*; *see also Scott v. United of Omaha Life Ins. Co.*, 749 F. Supp. 1089, 1093 (M.D. Ala. 1990) (Hobbs, J.); *Brown-Marx Assocs., Ltd. v. Emigrant Sav. Bank*, 703 F.2d 1361, 1370–71 (N.D. Ala. 1983).  Here, Plaintiffs testified that Sampson stated that he *would* take care of the situation.  In other words, Sampson did not tell them that the problem had *already* been solved or that their cancellation of the Country Road policy had *already* been vacated.  Thus, this would constitute promissory fraud because it was not relating an *existing fact*.

In order to establish promissory fraud, a plaintiff must also prove "that at the time the promise was made, there was an intent not to perform the promised act."  *Green Tree Acceptance*, 529 So. 2d at 206 (citing Ala. Code § 6-5-102; *Purcell Co. v. Spriggs Enters., Inc.*, 431 So. 2d 515, 519 (Ala. 1983); *see also Scott*, 749 F. Supp. at 1093 ("[U]nder Alabama law the failure to perform a promise is not itself sufficient to support a charge of fraud.  Absent any evidence from the plaintiff that the representation was made with the intent to deceive, the fraud count fails.") (citations omitted); *Brown-Marx*, 703 F.2d at 1370 ("[U]nder Alabama law failure to fulfill promises does not give rise to actionable fraud unless it is alleged and proved that the representations were made with intent to deceive and with no intent at the time the representations were made to carry them out.  Failure to perform a promise is not of itself adequate evidence of intent to support an action for fraud.") (citations omitted).  Here, this Court can find no evidence of an intent to deceive by Sampson at the time he promised that he "would take care of it."  Indeed, Plaintiffs themselves recognize that they "do not claim that the misrepresentations were 'made willfully to deceive'" but only that they were "reckless or, at the very least, by mistake."  (Doc. # 32, at 1).  However, given that the claims are disposed of on other grounds, this Court need not consider whether Plaintiffs have established the requisite intent to deceive for Sampson's promissory fraud.

reasonable jury could conclude otherwise.[13]  That Plaintiffs felt this very need to confirm that the policy was in force is evidenced by Mrs. Eley's failed attempt to e-mail Sampson the following day.  Similarly, a reasonable jury could only conclude that an ordinarily prudent person, *having filled out the cancellation request and having received no response on the confirmation email*, would have been even more diligent in ensuring that the policy was in effect.

However, Plaintiffs were not diligent in ensuring that the policy was in effect or in determining the nature of the premium refund checks.  Here, it is clear that both Mr. and Mrs. Eley are capable of reading and understanding the documents associated with this transaction—namely, the cancellation requests, the fax from Robinson, and the checks themselves.  Mrs. Eley endorsed and deposited the checks.  (Doc. # 26 Ex. E, Mr. Eley Dep. 8–15).  She testified that she knew that the checks were premium refund checks, but that she "assumed it was for all of the homes and autos that [they] had insured less this County Road property since [they] thought [they] were keeping that one in force and effect."  *Id.* Ex. H, Mrs. Eley Dep. 45:3–16.  Mr. Eley also testified that he did not recall ever actually seeing the check, but that he and his wife discussed the checks and she told

---

[13]    Plaintiffs' argument that their reliance was reasonable "in light of" Sampson's representations is circular.  Alabama law recognizes that oral representations may contradict the terms of the written documents associated with a transaction.  However, under Alabama law, reliance upon these oral assertions is unreasonable where the plaintiff "does not read [the documents] or investigate facts that should provoke inquiry."  *AmerUS*, 5 So. 3d at 1208.  The mere fact that a plaintiff is *told* one thing is not enough to make reliance upon it reasonable; rather, a plaintiff has a duty to *read associated written documents and to investigate facts that should provoke inquiry*.

him that they "had received [their] refund premiums." *Id.* Ex. E, Mr. Eley Dep.

76:16–77:2. Thus, there is no dispute that Plaintiffs knew at the time they received and

cashed the checks that the checks were for premium refunds.

Additionally, the Plaintiffs both testified that, had they known the premium refund

checks were for the County Road property, this would have directly conflicted with

Sampson's statement that the policy would still be in effect. *Id.* Ex. E, Mr. Eley Dep.

144:10–19 (stating that, had he known the checks were refunds on the County Road

policy, it would have directly contradicted what Sampson told him and he would have

"immediately . . . rectif[ied] the situation"); Ex. H, Mrs. Eley Dep. 47:11–23 ("If I had

known it was for a refund on [the County Road] policy, we would have been calling and

saying, Here, we need to send you some money because this policy is still in effect. We

didn't want it canceled.")). Thus, the only issue remaining is whether, based on the

circumstances, a reasonably prudent person would have read the premium refund checks

and understood that they were for the Country Road property. *See AmerUS*, 5 So. 3d at

1208.

It is undisputed that the premium refund checks both contain the account number

981902503, which is the account number assigned to policy 981902503-633-1—the

policy for the County Road property. A reasonably jury would find that a person who

deposits a check with an account number clearly visible, knowing that it is a premium

refund check, should determine the policy with which the account number was associated.

Furthermore, given the particular circumstances of this transaction—namely, the fact that Plaintiffs voluntarily signed and turned in a written cancellation request and received no response on their e-mail seeking to confirm that the disputed policy was, indeed, in effect—a reasonably prudent person should have been even more inclined to determine the policy with which the number was associated.  Plaintiffs may have honestly relied upon Sampson's statements that it would be taken care of; however, this does not change the fact that such reliance must also be reasonable.[14]  Therefore, this Court finds, as a matter of law, that Plaintiffs' reliance on Sampson's statements was not reasonable under Alabama law and that Defendants are entitled to summary judgment on Plaintiffs' fraudulent misrepresentation claims stemming from Sampson's statements.

## II.  Reasonable Reliance on Misrepresentations by Defendants in December of 2008

Even assuming a Travelers' agent made a material misrepresentation in December of 2008, Defendants contend that Plaintiffs' reliance on any such statement could not be reasonable as a matter of law because of the premium refund checks previously discussed. Under Alabama law, "'[f]raud is deemed to have been discovered when the person either actually discovered, or when the person ought to or should have discovered, facts which

---

[14]  Nor does it matter that Defendants' internal departments may have been confused as to the status of the account because the burden was on Plaintiffs to exercise reasonable diligence in the reading of written documents associated with this transaction.  That those written documents contradict the oral representations made by Sampson is clear from a simple reading of the checks and a simple inquiry into Plaintiffs' own records to determine the policy associated with the particular account number.  Furthermore, both Plaintiffs testified that if they had realized the premium refund checks were for the Country Road property—which simple checking of the account number on the checks would reveal—then they would have known that the policy was considered cancelled.

30

would provoke inquiry by a person of ordinary prudence, and, by simple investigation of the facts, the fraud would have been discovered.'" *AmerUS*, 5 So. 3d at 1208 (quoting *Gonzales v. U-J Chevrolet Co.*, 451 So. 2d 244, 247 (Ala. 1984)).  As previously stated, the fact that Defendants cancelled the policy should have been  discovered by Plaintiffs upon receipt of the premium refund checks.  Thus, at the time of any alleged misrepresentations in December of 2008, a reasonably prudent person would have already known that the policy was no longer in effect and could not have reasonably relied upon the oral misrepresentations that contradicted the written terms of the premium refund checks.  Thus, no reasonable jury could find that Plaintiffs reasonably relied upon these misrepresentations, and Defendants are entitled to summary judgment on Plaintiffs' fraudulent misrepresentation claims stemming from the alleged December 2008 misrepresentations.[15]

Because Defendants are entitled to summary judgment on all of Plaintiffs' fraudulent misrepresentation claims—*i.e.* those stemming from Sampson's statements in September of 2008 and those stemming from the unknown agent's statements in December of 2008—the motion to continue trial is due to be DENIED as MOOT.

---

[15]  In light of this Court's holding that Plaintiffs' have failed to establish reasonable reliance on either Sampson's statements in September of 2008 or Defendants' unknown agent in December of 2008, the issue of waiver need not be addressed.

**CONCLUSION**

For the foregoing reasons, it is hereby ORDERED that the Motion for Summary Judgment, (Doc. # 24), is GRANTED.

It is further ORDERED that the Motion to Continue Trial, (Doc. # 42), is DENIED as MOOT.

The Clerk of the Court is DIRECTED to remove the above-styled case from the trial docket.

The Court will enter a separate final judgment consistent with this Memorandum Opinion and Order.

DONE this the 18th day of February, 2011.


_____
/s/ Mark E. Fuller
CHIEF UNITED STATES DISTRICT JUDGE